In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1470

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VICTORIA MCGEE HARRIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:11-cr-30022-DRH-1—**David R. Herndon**, *Chief Judge.*

ARGUED NOVEMBER 1, 2012—DECIDED MAY 29, 2013

Before EASTERBROOK, *Chief Judge,* and ROVNER and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* As a broker-representative affiliated with MetLife, Inc., defendant-appellant Victoria McGee Harris sold insurance, annuities, and other financial investments to individual and family clients. Over the course of nearly eight years she stole more than $6 million of her clients' money. She pled guilty to mail fraud and money laundering and was sentenced

to 210 months in prison. She now appeals her sentence, arguing that the district court erred by (a) applying the sentencing guidelines by counting married couples as two separate victims for purposes of the total victim count, (b) denying her a fourth continuance of the sentencing hearing to give her more time to dispute the total loss amount used for guideline calculations, and (c) imposing an objectively unreasonable sentence. We affirm.

## I. *Factual and Procedural Background*

Harris was a registered representative of Tower Square Securities, which is an affiliated broker of MetLife. Doing business as Metro East Insurance Group (MEIG), Harris sold insurance, annuities, and other MetLife financial investments and products.

Investigations by the Illinois Securities Division, MetLife's Compliance Department, and the Internal Revenue Service revealed that for almost eight years, Harris had been diverting client investment funds into accounts that she used for personal and family purposes instead of investing those funds on behalf of her clients. She manipulated these client funds for her own purposes by using depositing and accounting methods that substantially departed from MetLife's standard practices for affiliated brokers.

MetLife had a standard procedure for affiliated brokers handling client investments. When a broker sold an investment to a client, the client paid for the invest-

ment with a check written to MetLife. The broker then entered the check into a log and within 24 to 48 hours forwarded the check to the appropriate recipient within MetLife.

Instead of following these procedures, Harris directed her clients to write their investment checks to her brokerage firm — MEIG. Instead of actually using the money to purchase the investment on behalf of the client, Harris would then deposit the check into one of two accounts in MEIG's name. Harris created a paper trail so that her check log and MetLife's records showed that she had actually deposited the funds on the client's behalf. She did this by putting cashier's checks in the client's file with the client's name as remitter, so it appeared that she had properly invested the client's funds, and she manipulated MetLife's investment tracking software to generate account summaries that falsely displayed the investments that her clients intended to purchase. Through this scheme, Harris was able to pocket her clients' money while making it seem as though she had actually invested it. Sometimes, Harris would later invest funds on a client's behalf, but often long after the client had written the check, and not for the correct amount.

Harris used the client money she deposited into the two MEIG accounts for personal and family purposes. She transferred large sums to several other bank accounts and investments that she used for herself and her family: credit cards, a trust account used to purchase family property, two clothing stores for her

daughters to run, and several other personal and family accounts.

The Illinois Securities Division began an audit of Harris' office after receiving a tip that Harris was not investing client funds properly. MetLife was notified of ISD's audit and began an independent investigation. The state agency notified the federal Internal Revenue Service and asked for its help with the investigation. The investigations proceeded by comparing deposits of client checks into the commingled MEIG account with actual client investments purchased from MetLife to see which client funds were properly invested and which were not. Because Harris occasionally later invested funds on a client's behalf after improperly depositing the original check into one of the MEIG accounts, investigators had to go through a tedious process of tracing each check individually and searching for possible investment matches to determine the total amount of funds that Harris stole from her clients. MetLife and state investigators were able to determine which client funds Harris had reinvested on a client's behalf and which funds remained in the accounts for her personal purposes.

Investigators concluded that Harris received nearly $11 million ($10,938,986.58) in client funds, of which she reinvested approximately $4 million ($4,055,945.73) on the clients' behalf. Of the remaining difference, she deposited more than $6.7 million into one MEIG account and approximately $112,000 into a different account in MEIG's name, both of which she ultimately

used for personal purposes. MetLife settled with all of Harris' clients who suffered a loss, ultimately paying more than $7 million. Investigators concluded that Harris had diverted funds from or caused losses to 79 victims, including MetLife, which incurred a loss by compensating the direct victims.

Harris pled guilty to one count of mail fraud under 18 U.S.C. § 1341 and to money laundering under 18 U.S.C. § 1957. The initial presentence investigation report used Guideline section 2B1.1, with a base offense level of seven, and recommended the following enhancements based on specific offense characteristics: 18 levels for a loss amount of more than $2.5 million but less than $7 million, four offense levels for more than 50 but fewer than 250 victims, two offense levels for using sophisticated means, and four offense levels for being a registered broker-dealer.

After receiving the initial report, Harris asked for four extensions of time to file objections and filed three motions to continue the sentencing. She argued in each continuance motion that she needed more time to determine an accurate loss amount and to object to the report's recommendations. The court granted all of them. When Harris filed a fourth motion to continue sentencing, though, the government objected and the court heard argument on the continuance. The court denied the motion and ordered that the sentencing hearing go forward as it had been scheduled. Harris filed an objection to the revised report arguing that the loss amount was less than $2.5 million, that the victim

count was fewer than 50, and that her conduct did not use sophisticated means but was only "typical fraud."

At the sentencing hearing, the court heard testimony from the chief investigator from MetLife and from the special agent with the criminal division of the IRS who had led the government investigation. The court also heard from several of Harris' victims and their family members. They recounted how Harris had ingratiated herself with her clients, who tended to be elderly, with exaggerated, friendly overtures such as visiting them in the hospital — often becoming close family friends — to manipulate their money and convince them to make the investments she suggested. Several victims explained that, in addition to the financial loss, they or their family members suffered deep emotional trauma upon discovering the extent of Harris' betrayal of their trust.

At sentencing, the court calculated a sentencing guideline range based on the testimony at the sentencing hearing. The court's calculation started with a base level of seven and included an additional 18 offense levels for a loss amount in excess of $2.5 million, an additional four offense levels for more than 50 victims, an additional two offense levels for sophisticated means, and several other offense level additions and reductions, amounting to a total offense level of 35. The final guideline range was 168 to 210 months. After hearing from Harris herself, the court sentenced her to 210 months in prison. The court reserved judgment on a final restitution amount and later issued an order re-

quiring Harris to pay $6,812,764.98 in restitution to MetLife to reimburse it for what it had paid to her clients.

## II. *Analysis*

Harris raises three arguments on appeal. First, she argues that the court counted too many victims by counting each married couple as two separate victims. Second, Harris argues that the court abused its discretion in denying her fourth motion to continue, which she claims was needed to dispute the total loss amount. Third, Harris argues that the court abused its discretion by imposing a sentence that was substantively unreasonable. We consider these issues in turn.

### A. *Number of Victims*

The relevant sentencing guideline enhancement for number of victims provides for an enhancement of four levels for 50 or more victims. U.S.S.G. § 2B1.1(b)(2)(B). At sentencing, the district court made a factual finding that the number of victims for guidelines purposes was 75, counting each married couple as two separate victims, and that the number would be 57 if each married couple counted as a single victim. Harris maintained that a victim count treating each married couple as a single victim would bring the total to 46, resulting in

a lesser sentence enhancement.[1] Harris now argues that the district court improperly applied the sentencing guidelines by counting both spouses as victims without evidence that each spouse suffered a loss.

We review *de novo* the district court's legal interpretation of sentencing guidelines and review factual findings for clear error. *United States v. McKinney*, 686 F.3d 432, 434 (7th Cir. 2012). We reject Harris' challenge to the victim enhancement on both legal and factual grounds.

We agree with the district court's legal interpretation of the victim number adjustment in section 2B1.1(b)(2). Where, as Harris conceded here, all of the accounts held by married couples were held jointly, there was no need for additional evidence to determine actual loss to each spouse. When a broker sells investment products to married clients who hold those accounts jointly, it is reasonable to conclude that both spouses suffer the loss or enjoy the gain, depending on the performance of the investment. See *United States v. Ellisor*, 522 F.3d 1255, 1275 (11th Cir. 2008) (finding no error for district

---

[1] Harris appears to have derived this number from the initial presentence report, which did not include several victims that the government later urged the court to include. The difference between the initial presentence report and the district court's factual finding of 75 resulted from including MetLife itself and several of Harris' clients who did not suffer a direct investment loss but suffered other types of loss, such as incurring fees for withdrawing funds prematurely and losses from Harris' choice of unsuitable investments.

court to count individually, for section 2B1.1(b)(2) purposes, students and parents who purchased tickets to fraudulent school event, and relying on *United States v. Densmore*, 210 F. App'x 965, 971 (11th Cir. 2006), commenting that "even in the case of money held jointly by a marital couple, both the husband and wife count as victims because each sustains 'part of the actual loss'"). Thus, it was proper for the district court to count a married couple holding investments jointly as two individual victims for the purposes of applying the section 2B1.1(b)(2) sentence enhancement.

On factual grounds, we also find no clear error in the district court's factual finding that the number of victims would still be 57, so the guideline range would not change, even if each married couple counted as a single victim. The district court did not err in its application of guideline section 2B1.1(b)(2).[2]

---

[2] One might fairly wonder why the ultimate legal and moral judgment about a defendant's sentence should turn on a question as abstract and artificial as whether to count a married couple as one or two victims. This is the sort of issue that helps remind those of us with responsibilities in the federal criminal justice system that the Sentencing Guidelines are advisory, not mandatory, and that district judges are free to deal with such abstract and artificial issues by telling the parties and reviewing courts that the decision on the final sentence did not depend on their resolution. See, e.g., *United States v. Sanner*, 565 F.3d 400, 406 (7th Cir. 2009) (affirming sentence where district court made clear that resolution of

(continued...)

B.  *Motion to Continue*

Harris argues that the district court abused its discretion in denying her fourth continuance because it denied her the opportunity to challenge the total loss amount upon which the court based a guideline enhancement. We review the district court's denial of a motion to continue for abuse of discretion and actual prejudice. *United States v. Crowder*, 588 F.3d 929, 936 (7th Cir. 2009).

Harris argued that the district court should grant her fourth motion to continue sentencing because the government's account of the total loss amount could have been inaccurate for several reasons. First, Harris pointed to one client deposit — a check from a Betty Shivley — that the investigators had included in the loss amount but that had actually been deposited on Ms. Shivley's behalf. Harris argued that there could be more deposits like the Shivley check, which the investigators had mistakenly counted toward the loss amount even though the funds were actually reinvested on the client's behalf. In the sentencing hearing, the MetLife investigator testified that the Shivley deposit was an error, but that she was confident in the investigation's results notwithstanding the error because it was

---

[2]  (...continued)

knotty issue under Guidelines did not affect final sentence); cf. *United States v. Lopez*, 634 F.3d 948, 954 (7th Cir. 2011) (reversing sentence where district court applied Guidelines erroneously and did not indicate that disputed Guideline issue would not affect final sentence).

a single oversight, not an indication of the inadequacy of the overall investigation process.

Second, Harris points to 133 cashier's checks that she claims the government labeled as "follow-up." She argues that the government failed to confirm whether those checks had ultimately been invested on the clients' behalf. At the hearing on Harris' fourth motion to continue, the IRS investigator testified that 131 of those checks had been accounted for and that the total amount of the 133 checks was approximately $440,000.

Third, Harris claims that the investigators did not have access to the bank records for the smaller MEIG account (into which Harris deposited approximately $112,000) for four of the relevant years, from 2004 to 2008.

The district court denied the continuance, finding that more time to dispute the loss amount would do little to change the sentencing guideline enhancement for the total loss amount. Harris' ultimate loss amount enhancement was based on a range of more than $2.5 million but less than $7 million. The district court observed that even if Harris' objections to the method of calculating the loss amount were valid, they would not affect the guideline range. The 133 checks amounted to only $440,000. The court also found that the essence of Harris' objections about whether the investigation might have missed more checks such as the Shivley check went to the weight and credibility of the investigators' testimony at sentencing on the accuracy of the tracing process, so that additional time would not reveal new information relevant to the loss amount.

We find no abuse of discretion or prejudice here. The court acted within its discretion when it determined that additional time to prepare was unlikely to affect the final guideline range because the amounts at stake in Harris' objections could not have reduced the total loss amount below the $2.5 million floor of the relevant guideline range. There was no need for the court to make an exact calculation of the loss, see U.S.S.G. § 2B1.1, Note 3(C) ("The Court need only make a reasonable estimate of the loss."), and the possibility that further investigation would alter the guideline calculation was remote. See *United States v. Knorr*, 942 F.2d 1217, 1222 (7th Cir. 1991) ("mere possibility that some additional evidence would be obtained to further contest the nature of the defendant's role in the offense is insufficient"). The total amount in the MEIG account with allegedly missing bank statements was approximately $112,000, and the 133 "follow-up" checks totaled approximately $440,000. Because the loss amount was more than $6 million and the relevant guideline enhancement would have changed only if the amount had dropped below $2.5 million, neither could change the enhancement.

The district court's denial of this motion for a continuance was especially reasonable, of course, in light of the fact that it was Harris' fourth such motion. Sentencing had already been delayed for eight months on Harris' first three motions to continue, and the government had made all of its investigation files available during discovery. Given this history of Harris' repeated motions for continuances and the resulting delays, the district

court acted well within its discretion in denying Harris more time to investigate further the loss amount. This situation is similar to *United States v. Rinaldi*, where we upheld a district court's denial of a fourth motion to continue for further investigation of loss calculations. 461 F.3d 922, 929 (7th Cir. 2006) ("Considering the span of years between the entry of Rinaldi's guilty plea, the multiple continuances granted by the district court, and the questionable value of the analysis, we cannot find that no reasonable person would agree with the district court's denial of defendant's motion."). The district court did not abuse its discretion in denying Harris' fourth motion for a continuance where it had reasonably determined that additional time would not affect the relevant guideline enhancement and that Harris had received sufficient time to contest the loss amount.

C. *Substantive Reasonableness*

Finally Harris argues that her sentence is substantively unreasonable on several grounds: she is a first-time offender and therefore less likely to re-offend; her crime was a "white-collar crime," a category she argues is not deterred by longer sentences; the seriousness of her offense was overstated; and her sentence is not reasonable compared to other similar cases because her victims received restitution from MetLife.

In considering such a challenge to a sentence, we consider whether the sentence is unreasonable with regard to 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220,

261 (2005). A sentence is reasonable if the district court gives "meaningful consideration" to the factors listed in section 3553(a) and the resulting sentence is "objectively reasonable in light of the statutory factors and the individual circumstances of the case." *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008). The court need not consider all the factors but must give an "adequate statement of reasons . . . for thinking the sentence it selects is appropriate." *Id*. A sentence that is within the relevant guidelines range is presumed to be reasonable on appeal. *United States v. Meschino*, 643 F.3d 1025, 1030 (7th Cir. 2011), citing *Rita v. United States*, 551 U.S. 338, 347 (2007).

Here, the sentence was within the applicable guideline range and the district court gave meaningful consideration to Harris' sentence in light of the section 3553(a) factors, especially the nature and seriousness of the crimes, § 3553(a)(1), (2)(A), the need for deterrence, § 3553(a)(2)(B), and comparison to other similar cases, § 3553(a)(6). After hearing statements from several of Harris' victims or their family members, the court explained its reasons for imposing a sentence at the top of the guideline range. In addressing the nature of the crime, the court noted Harris' unique approach of ingratiating herself to victims so that they would not question her decisions with regard to their money, her "obvious pattern of targeting older persons" who may have been especially vulnerable, and how this harm to victims was especially serious and intangible. On the seriousness of the crime, the court noted that even if the guidelines changed to recommend a lower sentence, the

court would impose a long sentence because "the effect on these victims in this case and the amount of loss in this case is such that it simply does not overrepresent the defendant's criminal acts."

The court also considered the defendant's arguments about deterrence and comparison to similar cases. Harris' counsel argued that she should receive a lower sentence because empirical studies indicate that first-time offenders are unlikely to re-offend and long sentences have little deterrent effect on white-collar criminals. In response, the court noted that, because of her age and approach with vulnerable victims, Harris was "quite unique" and "not in any way typical or one who can be appropriately measured by the empirical studies. . . ." The court was not persuaded that a lower sentence was appropriate or that a longer sentence would be unnecessary. Rather, the court found that "there is a reason for the court to be concerned about deterrence and protecting the public."

In response to Harris' argument that a long sentence would be unreasonable compared to similar cases because her victims received restitution, the court noted that Harris' victims were not made whole in every respect and that "[t]his argument fails to take into account many of the intangibles in this case that we've heard about in terms of the losses felt by the victims." The court also noted "how the defendant wove herself in the fabric of the victims' lives through her hugs and kisses and assurances, these sales tactics that made them trust the defendant and believe in her,

and her criminal acts of fraud and deception that ultimately left them so devastated."

Given the court's thorough consideration of the specific circumstances of Harris' crime, the court imposed a reasonable sentence in light of the section 3553(a) factors and adequately explained its consideration of those factors. Harris' arguments on appeal do not overcome our presumption that the within-guideline sentence was reasonable.

The judgment of the district court is AFFIRMED.