In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3050

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

YESI IVAN HERNANDEZ SANDOVAL,
a/k/a ADRIAN PAYAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09-CR-00308 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED FEBRUARY 20, 2014 — DECIDED MARCH 28, 2014

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Yesi Ivan Hernandez Sandoval pleaded guilty to attempting to possess 20 kilograms of cocaine. He appeals the district court's imposition of an obstruction of justice enhancement, withholding of credit for acceptance of responsibility, and denial of safety-valve relief from the statutory mandatory minimum. Finding no error, we affirm.

## I. Background

Yesi Ivan Hernandez Sandoval, a Mexican citizen, illegally entered the United States in the mid-1990s. He was voluntarily removed from the United States on March 2, 2000. After illegally re-entering the United States, Sandoval was again voluntarily removed on April 24, 2000, and then a third time on August 5, 2000. He was subjected to expedited removal on May 15, 2003, and again on April 12, 2004. Sandoval again attempted to illegally re-enter the United States and, on July 17, 2005, was convicted of attempted illegal entry by means of false misrepresentation. Thereafter, he was removed yet again. Undeterred, Sandoval illegally re-entered the United States later in 2005 and was arrested after providing a false name to a police officer during a traffic stop. According to Sandoval, he pleaded guilty to illegal entry into the United States and to failing to present identification to law enforcement. He was removed, but re-entered the United States in 2006. At that time, he began working for his father's painting business located in El Paso, Texas. He continued to work for his father until his arrest in this case.

On March 30, 2009, Sandoval met Richard Quinonez at a truck stop in Monee, Illinois. Sandoval was supposed to purchase 20 kilograms of cocaine that he believed Quinonez had transported from Texas. During the meeting, Sandoval gave Quinonez $500 for fuel expenses and said that he would pay $300,000 for the cocaine on the following day. Unbeknownst to Sandoval, Quinonez had been arrested earlier that day and was cooperating with law enforcement. Thus, Quinonez was only carrying sham cocaine and the rendezvous as surreptitiously recorded by law enforcement. During the

meeting, Quinonez told Sandoval about all the driving and the number of drug deliveries he had to do. In turn, Sandoval remarked that "[s]ometimes we go all the way to Boston." When Quinonez pressed him, Sandoval confirmed that the "work" was over in Boston and that they would send a truck to Boston. Quinonez then gave Sandoval two duffle bags containing sham cocaine. Sandoval placed the duffle bags in his vehicle and departed.

Subsequently, law enforcement stopped Sandoval's vehicle. A search of the vehicle revealed cocaine as well as the duffle bags full of sham cocaine. Sandoval denied knowing what was inside the duffle bags. Sandoval was arrested and charged with attempted possession of cocaine in violation of 21 U.S.C. §§ 841, 846. At the time of his arrest, Sandoval gave a false name—Adrian Payan—to the arresting officers.[1] Sandoval continued to invoke the Payan alias at his pretrial services interview, initial appearance, and other court proceedings. The district court granted Sandoval bond and released him on his own recognizance.

In January 2012, the government finally learned Sandoval's true identity and that he was present illegally in the United States. Sandoval's bond was then revoked and he was taken into custody.

On April 1, 2013, about two weeks before trial, Sandoval met with the prosecutor and law enforcement officers for a safety-valve interview. At the interview, Sandoval stated that

---

[1]  According to Sandavol, he acquired the Payan alias in New Mexico around 2006 or 2007.

he was in Chicago on the day of his arrest to visit a family friend and not to traffic in narcotics. He asserted that someone he knew only as "Black Diamond" contacted him and asked him to pick up the drugs from Quinonez and deliver them to someone else as a favor. He stated that he only learned that he was picking up cocaine when he met Quinonez. Sandoval stated that he was supposed to receive between $500 and $1,000 for helping "Black Diamond." He also explained that he had just made up the $300,000 figure when meeting with Quinonez in order to make his role in picking up the drugs appear more credible.

Sandoval elected to plead guilty shortly before trial. As a factual basis for his plea, Sandoval stated: "I only knew that I was going to pick up drugs but I did not know what type of drugs it was. I also knew that I had to deliver it to someone else but I did not know who that other person was."[2]

At sentencing, the government argued that Sandoval's use of the Payan alias constituted obstruction of justice. Thus, the government sought a two-level upward adjustment to Sandoval's offense level pursuant to U.S.S.G. § 3C1.1. For his part, Sandoval argued that his decision to plead guilty demonstrated acceptance of responsibility, and he sought a two-level downward adjustment pursuant to U.S.S.G. § 3E1.1(a). Each side opposed the other's proposed adjustment. Additionally, Sandoval's offense carried a statutory minimum sentence of 120 months. *See* 21 U.S.C. § 841(b)(1)(A). But 18 U.S.C.

---

[2] Because Sandoval's plea was blind, the district court told him: "I ask a defendant only to tell me as to what you did relating to the count that you're pleading guilty … ."

§ 3553(f), the so-called "safety valve," eliminates the applicability of any statutory minimum sentence provided certain conditions are met. *See also* U.S.S.G. § 5C1.2. One of those conditions is that "the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan … ." 18 U.S.C. § 3553(f)(5). Sandoval argued that he was entitled to the safety valve based, in part, on his April 1, 2013, meeting with the prosecutor and law enforcement officers. The government disagreed.

The district court concluded that Sandoval's misrepresentations about his identity at arrest and throughout the criminal proceedings warranted the obstruction of justice enhancement. The district court also denied Sandoval's requests for the acceptance of responsibility downward adjustment and application of the safety valve. As a result, the district court calculated Sandoval's guidelines range at 188–235 months. If the district court had declined to impose the obstruction of justice enhancement and had granted the acceptance of responsibility reduction, then Sandoval's guidelines range would have been 97–121 months. Moreover, because the district court did not apply the safety valve, Sandoval's sentence had to be at least 120 months.

Ultimately, the district court imposed a sentence of 140 months' imprisonment. The district court remarked that "even if there was no mandatory minimum, I would have sentenced the defendant based on all the factors to 140 months of imprisonment based on the quantity of the drugs, the aggravating circumstances, other aggravating circumstances that the Court

has addressed and based on the mitigating circumstances, that he indicates he's a changed man." Sandoval appeals his sentence.

## II. Analysis

On appeal, Sandoval challenges the imposition of the obstruction of justice enhancement, the withholding of credit for acceptance of responsibility, and the denial of safety-valve relief from the statutory mandatory minimum. Sandoval's first two challenges concern the district court's calculation of his guidelines range. *See United States v. Chapman*, 694 F.3d 908, 913 (7th Cir. 2012) ("To avoid procedural error, sentencing judges must correctly calculate the guidelines range, evaluate the factors in 18 U.S.C. § 3553(a), and rely on properly supported facts."). "We review *de novo* the district court's legal interpretation of sentencing guidelines and review factual findings for clear error." *United States v. Harris*, 718 F.3d 698, 703 (7th Cir. 2013). But "[w]e review a district court's acceptance of responsibility determination for clear error." *United States v. Fudge*, 325 F.3d 910, 923 (7th Cir. 2003). Respecting his third challenge, Sandoval bears the burden of proving that the safety valve applies. *United States v. Acevedo-Fitz*, 739 F.3d 967, 970 (7th Cir. 2014). "We review a district court's refusal to apply the safety valve for clear error." *Id.*

Sentencing Guideline § 3C1.1 provides for a two-level upward adjustment where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction … ." And Application Note 4 to that guideline states that the enhance-

ment applies where the defendant provided "materially false" information to law enforcement or judicial officers.

However, Application Note 5(A) states that the guideline ordinarily should not be applied where the defendant merely provided "a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense." Sandoval contends that his use of the Payan alias falls within the scope of Application Note 5(A) because his lie did not actually result in a significant hindrance to the investigation or prosecution of his drug distribution offense. However, we have previously had occasion to interpret Application Note 5(A), and we held that it only applies to "the provision of false information at the *time of arrest*." *United States v. Bedolla-Zavala*, 611 F.3d 392, 396 (7th Cir. 2010) (emphasis in original). Application Note 5(A) does not apply where the defendant makes false statements to a court officer after arrest. *Id.* ("This distinction in the application note embodies the Commission's reasoned—and realistic—judgment that a false statement to a court officer, in the preparation of a specific report to be used by the court for a specific decision, is a far more serious matter than an opportunistic lie made during the confrontation of an arrest situation.").

Sandoval also argues that his lie was not "material," within the meaning of Application Note 4, because his lie did not "tend to influence or affect" his criminal prosecution. *See* U.S.S.G. § 3C1.1, Application Note 6. But this argument is also foreclosed by *Bedolla-Zavala*. In that case, we observed that "[p]ersonal information is a highly relevant factor in determining whether a defendant should remain in custody or be

granted bond, and thus is material not only at sentencing, but at arraignment." *Bedolla-Zavala*, 611 F.3d at 396. Thus, we held that the defendant's use of a false identity was "material" because, "when coupled with deception about his legal status in the United States, certainly could have influenced the district court's decision about whether or not to detain him following his arraignment." *Id.* This holding applies equally to Sandoval, who lied about his identity and thereby concealed his illegal presence within the United States. Indeed, once the district court learned of Sandoval's true identity and immigration status, the court revoked Sandoval's bond and had him taken into custody. This indicates that Sandoval's lie "tend[ed] to influence or affect" the district court's decision about whether to detain Sandoval following his arraignment. *Id.* Moreover, Sandoval had a number of prior convictions—mostly related to his illegal entries into the United States. Thus, Sandoval's use of the Payan alias also "could certainly have influenced the" district court's bond decision by misleading the court into thinking that he was a first-time offender. *Id.* Sandoval does not contend that we should overrule *Bedolla-Zavala*. Consequently, Sandoval has failed to establish that the district court erred in imposing the obstruction of justice enhancement.

Next, Sandoval challenges the district court's denial of credit for acceptance of responsibility. He concedes that Application Note 4 to Guideline § 3E1.1 provides that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." But Sandoval points out that the

application note goes on to state that "[t]here may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply."

Sandoval contends that his case is extraordinary because his use of the Payan alias did not actually impede the prosecution of the case, he did not flee after being released on bond, he maintained contact with the pretrial services department, he pleaded guilty, and he participated in a safety-valve interview wherein he admitted to his involvement in the drug transaction. We disagree. Sandoval's deception regarding his identity was repeated and long-lasting. And it was only because the government discovered the truth that Sandoval's deception was eventually uncovered. Moreover, refraining from becoming a fugitive is the bare minimum expected of every criminal defendant. It is far from extraordinary. Additionally, Sandoval did not plead guilty until one week before trial—after the government had uncovered his true identity and prepared for trial. And his factual account of the offense offered in support of his guilty plea was minimal.

Regarding his safety-valve interview, Sandoval provided the government with little helpful information. More importantly, Sandoval made a number of implausible or false assertions. For example, he claimed that he was sent to pick up twenty kilograms of cocaine by someone he did not know and was instructed to deliver it to someone he did not know. He asserted that he was performing the pick-up merely as a "favor" for the person he did not know and that he made up the $300,000 figure when telling Quinonez how much he was going to pay for the cocaine. Sandoval also claimed that he did not know that he was picking up cocaine until Quinonez told

him so. Yet the recording of Sandoval and Quinonez's meeting reveals that Quinonez never told Sandoval that the duffle bags contained cocaine. Furthermore, Sandoval spoke with Quinonez about drug trafficking and discussed traveling to Boston for "work." But Sandoval did not reveal anything about Boston during the safety-valve interview. *See* 18 U.S.C. § 3553(f)(5) (providing that the defendant must *truthfully* provide *all* information and evidence) (emphasis added).

Sandoval points to nothing demonstrating that his case reflects extraordinary acceptance of responsibility. And the district court did not clearly err in finding that Sandoval "was not truthful in his statements to the government … ." Consequently, the district court did not clearly err in declining to grant Sandoval credit for acceptance of responsibility. For the same reasons, the district court did not clearly err in refusing to apply the safety valve. *See Acevedo-Fitz*, 739 F.3d at 970 ("[The defendant] bore the burden of proving by a preponderance of the evidence 'that he provided a full and honest disclosure.'" (quoting *United States v. Montes*, 381 F.3d 631, 637 (7th Cir. 2004))).

### III. Conclusion

There is no dispute that Sandoval deceived court officers about his identity and citizenship. And the district court did not clearly err in finding that Sandoval failed to express extraordinary acceptance of responsibility for his crime and that he did not truthfully provide all information and evidence related to his criminal conduct at his safety-valve hearing. Therefore, the district court did not err in imposing the obstruction of justice enhancement, withholding credit for

acceptance of responsibility, or denying safety-valve relief from the statutory mandatory minimum. Consequently, we AFFIRM Sandoval's sentence.