In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 14-2914

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BELAL FARUKI,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cr-00117 — **Rubén Castillo**, *Chief Judge.*

---

ARGUED SEPTEMBER 10, 2015 — DECIDED OCTOBER 13, 2015

---

Before FLAUM, RIPPLE, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Belal Faruki was convicted of wire fraud in federal district court on January 17, 2014. The jury determined that, between January 2010 and January 2011, Faruki operated an investment scheme through which he defrauded one investor, Marc Tishfield, and attempted to defraud a second investor, Richard Schottenfeld. Following denials of Faruki's motion for a judgment of acquittal and motion for a new trial, the district court sentenced Faruki to

forty-eight months in prison. Faruki now challenges the suf-
ficiency of the evidence underlying his convictions, as well as
two evidentiary rulings by the district court. We affirm.

## I. Background

Faruki met Tishfield in 2006 while Tishfield was working
as a portfolio manager at SAC Capital, a Connecticut-based
hedge fund. At the time, Faruki was a computer technology
consultant retained by SAC Capital to help examine and im-
prove its electronic trading systems. Faruki and Tishfield
stayed in touch after Faruki completed his project at SAC
Capital, periodically meeting in person and communicating
by telephone, e-mail, and instant message.

In January 2010, Faruki informed Tishfield that he had
launched his own investment fund, Neural Markets, using
mathematically-driven trading strategies. Faruki stated that
he was currently investing his own money in the fund in an
effort to establish a trading history he could pitch to prospec-
tive investors. He told Tishfield that in December 2009 his
fund had achieved investment returns exceeding 12%, and
that his investment return in January 2010 was 32%. Faruki
also told Tishfield that he had hired RSM McGladrey, an ac-
counting firm, to audit his fund's investment performance.

On August 25, 2010, Faruki sent Tishfield an e-mail outlin-
ing the investment strategy and returns achieved by Neural
Markets. Faruki's e-mail indicated that the fund had been
trading since March 2009 and had achieved investment re-
turns exceeding 200%. Faruki also represented that Neural
Markets employed "almost zero leverage." According to a
document attached to the e-mail, Neural Markets' prime bro-
kers were TradeStation and JPMorgan, and the fund's profits

and losses were accounted for by Liccar CPA and audited by RSM McGladrey. Marketing materials attached to the e-mail stated: "Neural Markets currently manages only a simulated portfolio."

Tishfield testified at trial that he and Faruki had several conversations in which they discussed the meaning of "simulated portfolio." According to Tishfield, Faruki said that he was managing $5 million in assets for wealthy clients in Chicago. Faruki explained that his "simulated" investing accounts mirrored his trading for wealthy Chicago clients, but did not contain clients' specific information in an effort to protect their identities.

On September 5, 2010, Faruki sent Tishfield a private placement memorandum ("PPM") for the Neural Markets fund. A PPM is commonplace in the investment fund industry and governs all of the terms of an investment. The PPM stated that TradeStation and JPMorgan would be the prime brokers, Liccar CPA would be the fund administrator, RSM McGladrey would be the auditor, and Foley & Lardner LLP would be the fund's legal counsel. The PPM also provided that Faruki would not use leverage when investing Tishfield's funds, except in exceptional circumstances. Tishfield signed the PPM and committed to invest $1 million in the Neural Markets fund on September 8, 2010.

On September 16, 2010—after Tishfield signed the PPM but before he transferred funds to Faruki—Faruki met with Tishfield and Tishfield's brother-in-law, Richard Schottenfeld, at Schottenfeld's office in Manhattan. Schottenfeld is the chairman of a trading firm in New York City called Schottenfeld Capital. During this meeting, Faruki told both Tishfield and Schottenfeld that he was trading Neural Markets' funds

in trading accounts at a broker-dealer called TradeStation, and that the fund was using JPMorgan as a clearing broker. Tishfield also recalled Faruki saying that he had attended either Boston University or Boston College. Schottenfeld decided not to invest with Faruki following the meeting.

At trial, the government presented evidence that much of the information Faruki gave to Tishfield prior to Tishfield's decision to invest in Neural Markets was false. For instance, an FBI agent analyzed Faruki's bank and trading account records, as well as his hedge funds, and determined that Faruki never traded $5 million for other investors. In fact, Faruki and his hedge funds never traded any funds for any investors other than Tishfield. Additionally, a representative from Liccar CPA testified that Faruki had not hired the accounting firm in August 2010 and that the firm does not provide the type of reporting that Faruki represented it would provide in his August 2010 e-mail to Tishfield. Similarly, the managing director of RSM McGladrey testified that Faruki never retained RSM McGladrey to provide auditing services. The parties stipulated that Faruki never had any prime brokerage accounts at JPMorgan. The government also offered evidence showing that from January 27, 2010 through September 24, 2010, Faruki was prohibited from selling securities in or from Illinois (the "Illinois Order of Prohibition").[1] Faruki did not dispute at trial—nor does he dispute on appeal—that he did not attend either Boston University or Boston College.

---

[1] In January 2010, the State of Illinois Department of Securities issued an Order of Prohibition against Faruki for engaging in fraud in the sale of securities.

Sometime in September 2010, Faruki opened his first account at TradeStation. The account he opened was an individual account, into which he deposited $150,000. Faruki subsequently applied for an institutional account on behalf of Neural Markets. In evaluating Faruki's application for an institutional account, TradeStation discovered the Illinois Order of Prohibition and denied Faruki's application. TradeStation also closed Faruki's personal account. TradeStation's general counsel informed Faruki that TradeStation was no longer interested in doing business with him.

In the process of trying to open the personal and institutional TradeStation accounts, Faruki made a number of false representations to two TradeStation employees, Lance Baraker and Charles Runyon. These representations included some of the same representations that Faruki made to Tishfield and Schottenfeld, including that Faruki was managing $5 million in investor funds.

On September 28, 2010, Tishfield sent Faruki $1 million by wire transfer to a Neural Markets bank account to invest in the Neural Markets fund. Even though TradeStation had denied Faruki's request for an institutional account and closed his personal account, Faruki told Tishfield that TradeStation would open the account within a week. Faruki had previously represented to Tishfield that he would begin trading Tishfield's investment on October 1, 2010.

The government alleges that following his encounter with TradeStation, Faruki had two of his friends open institutional accounts at TradeStation in the name of Evolution Quantitative 1X, LLC ("Evolution Quantitative"), accounts which Faruki secretly controlled. Faruki then transferred Tishfield's $1

million into a newly opened bank account in the name of Evolution Quantitative. He subsequently transferred the money into the Evolution Quantitative accounts at TradeStation, where he traded Tishfield's funds.

In November 2010, TradeStation discovered that Faruki controlled the Evolution Quantitative accounts and terminated them. Faruki—again through friends—then set up another trading account at a different broker-dealer, Interactive Brokers, and transferred Tishfield's money to that account. Faruki informed Tishfield that his money was being transferred to the Interactive Brokers account, but represented that TradeStation had closed the initial account due to a "trading error."

In December 2010, Tishfield received his first account statement from Liccar CPA, which reported significant losses associated with his $1 million investment. Tishfield asked Faruki to return what was left of his investment but Faruki refused, citing the PPM. Faruki also reminded Tishfield that under the terms of the PPM, he was permitted to use Tishfield's investment funds to defend himself against any lawsuit initiated by Tishfield.

On February 6, 2013, a grand jury indicted Faruki on seven counts of wire fraud, in violation of 18 U.S.C. § 1343. The indictment alleged that between January 2010 and January 2011, Faruki operated a fraudulent investment scheme in which he defrauded Marc Tishfield out of $1 million and attempted to defraud Richard Schottenfeld.

Faruki was tried in January 2014, and the jury found him guilty on Counts 1, 2, 3, 4, 5, and 7.[2] After trial, Faruki filed a motion for a judgment of acquittal and a motion for a new trial. The district court denied both motions. On August 20, 2014, the district court sentenced Faruki to forty-eight months in prison. Faruki appeals, challenging the sufficiency of the evidence underlying his convictions as well as two evidentiary rulings by the district court.

## II. Discussion

### A. Sufficiency of the Evidence Against Faruki

Faruki claims that the government failed to prove his guilt as to wire fraud (Counts 1, 2, and 3) and the transfer of funds in furtherance of a scheme to defraud (Counts 4, 5, and 7). According to Faruki, there is insufficient evidence he made "false or material statements" or that he "used wires in furtherance of fraud." "In reviewing the sufficiency of the evidence, we review the evidence in the light most favorable to the government, and we will overturn a jury verdict only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Garten*, 777 F.3d 392, 400 (7th Cir. 2015).

*1.  Wire Fraud: Counts 1, 2, and 3*

To sustain a conviction for wire fraud, the government must show that Faruki: "(1) was involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of that scheme." *United States v. Durham*, 766 F.3d

---

[2] Counts 1, 2, and 3 address Faruki's culpability for wire fraud. Counts 4, 5, and 7 pertain to specific fund transfers for the purpose of executing a scheme to defraud. The government dismissed Count 6.

672, 678 (7th Cir. 2014). Faruki argues that the government's evidence was insufficient to prove both that he participated in a scheme to defraud and that he had an intent to defraud.

"A scheme to defraud requires the making of a false statement or material misrepresentation, or the concealment of [a] material fact." *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009) (alteration in original) (citation and internal quotation marks omitted). Marc Tishfield testified that Faruki made a number of false statements to him, as well as his brother-in-law, Richard Schottenfeld, in order to convince both men to invest in the Neural Markets fund. In reviewing the evidence in the light most favorable to the government, we must take Tishfield's testimony as true—that Faruki told Tishfield he was managing $5 million in real investor funds, had active accounts at TradeStation and JPMorgan, and had hired RSM McGladrey to audit his fund, among other misrepresentations—and accept that Faruki made these false statements. The government independently verified that many of the statements alleged were false by obtaining records from TradeStation, JPMorgan, and RSM McGladrey, offering further proof that Faruki was untruthful regarding accounts and services obtained from these institutions.

We are not convinced by Faruki's argument as to Counts 1, 2, and 3 that the government failed to sufficiently corroborate Tishfield's testimony regarding what Faruki told Tishfield before he invested in the Neural Markets fund. Schottenfeld testified that Faruki told both Schottenfeld and Tishfield that he was managing $5 million for real investors. Additionally, during a September 20, 2010 instant message conversation between Tishfield and Faruki that took place eight days before Tishfield wired his $1 million investment, Tishfield

asked Faruki whether it had been a good day or a bad day for his accounts. Faruki responded that all of his accounts, including "5m simulation, 5m real, 150k everything," had suffered losses. The government reasonably construed this statement as a representation by Faruki that he had a simulated account containing $5 million, an account containing $5 million from real investors, as well as a personal account containing $150,000. A rational juror could conclude that the instant message, as well as Schottenfeld's testimony, sufficiently corroborated testimony from Tishfield.

With respect to the intent requirement, a rational trier of fact could find that the government established Faruki's intent to defraud beyond a reasonable doubt. "[I]ntent to defraud requires a wilful [sic] act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010) (internal citation and quotation marks omitted). There is ample evidence that Faruki made false statements in order to induce Tishfield into investing in the Neural Markets fund for Faruki's own financial gain.

The government offered sufficient evidence such that a rational juror could conclude that Faruki participated in a scheme to defraud and that he had an intent to defraud. Accordingly, his challenge to the sufficiency of the evidence as to his convictions on Counts 1, 2, and 3 fails.

## 2.  *Wire Transfers in Furtherance of Fraud: Counts 4, 5, and 7*

With regard to Counts 4, 5, and 7,[3] Faruki argues that the evidence is insufficient to support his conviction for two reasons. First, he claims that the wire transfers at issue occurred after the alleged scheme to defraud was complete. Second, he claims that the government presented insufficient evidence that he controlled these wire transfers. All of the relevant transfers occurred after Tishfield wired his $1 million investment to Faruki.

Despite the fact that Faruki executed these wire transfers after Tishfield had handed over his money, we can properly consider the transfers as part of Faruki's scheme to defraud. In *United States v. Sampson*, the Supreme Court held that a defendant may be charged with the commission of fraudulent activities carried out both before and after money is obtained from the victims. 371 U.S. 75, 80 (1962). In that case, defendants were charged with mail fraud and the district court dismissed thirty-four counts on the grounds that the mails were not used for the purpose of executing the alleged scheme, as required by the statute. *Id.* at 76. Defendants were accused of fraudulently inducing victims to pay for services defendants never had any intention of performing. *Id.* at 77. The Supreme Court rejected the argument that actions by defendants that occurred after the victims paid defendants money were not part of the fraudulent scheme: "[T]he indictment alleged that

---

[3] Count 4 concerns the transfer of money from the Neural Markets bank account to the Evolution Quantitative bank account. Count 5 concerns the transfer of money from the Evolution Quantitative bank account to the Evolution Quantitative TradeStation accounts. Count 7 concerns the transfer of funds from the Evolution Quantitative bank account to the lawyer for Neural Markets.

the scheme … included fraudulent activities both before and after the victims had actually given over their money to the defendants." *Id.* at 78. The Court held that the district court erred in dismissing the thirty-four counts. *Id.* at 81.

The logic of *Sampson* applies in this case. It is clear that as part of his scheme, Faruki planned to invest Tishfield's money in a trading account, which required several transfers of funds. This is evidenced by Faruki's numerous efforts to open accounts at TradeStation and Interactive Brokers. Faruki made false representations in soliciting Tishfield's investment as well as in transferring Tishfield's money to various accounts. The evidence therefore demonstrates that wire transfers executed after Tishfield delivered his $1 million investment to Faruki were part of an overall scheme to obtain and trade Tishfield's funds.

Faruki also argues that we should reverse his convictions on Counts 4, 5, and 7 on the grounds that there is insufficient evidence to suggest that Faruki actually controlled the wire transfers identified in these counts. Faruki claims that because his name was not on the wire transfers, no reasonable jury could conclude that he caused the transfers to occur in furtherance of his fraudulent scheme. Yet, the federal wire fraud statute states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits *or causes to be transmitted* by means of wire … any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this

> title or imprisoned not more than 20 years, or
> both.

18 U.S.C. § 1343 (emphasis added). Under the terms of the statute, it is enough that Faruki "caused" the funds to be transmitted.

The record offers ample evidence that Faruki caused the wire transfers, even if the transfers were not in his name or the name of his fund, Neural Markets. For instance, Faruki had friends open TradeStation accounts in the name of "Evolution Quantitative" after he failed to open an institutional account himself. TradeStation ultimately terminated the Evolution Quantitative trading accounts when it discovered that Faruki controlled these accounts. Faruki does not challenge the veracity of this evidence.

In sum, a rational juror could conclude, beyond a reasonable doubt, that the wire transfers executed after Tishfield delivered the money were part of Faruki's overall scheme, and that Faruki caused the funds to be transmitted. Faruki's convictions on these counts must stand.

## B. Evidentiary Rulings

Faruki challenges two of the district court's evidentiary rulings at trial. He argues that the district court erred in allowing the TradeStation audiotapes to be introduced. He also claims that the court's limitation of his cross-examination of Lance Baraker, a TradeStation employee, violated Federal Rule of Evidence 106 and his Sixth Amendment rights.

"The evidentiary rulings of the district court are given special deference[.]" *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 621 (7th Cir. 2003). We review such decisions for an abuse

of discretion. *United States v. Wilburn*, 581 F.3d 618, 622 (7th Cir. 2009).

### 1. TradeStation Tapes

Faruki argues that the district court abused its discretion by allowing the government to play portions of TradeStation audiotapes for the jury. These tapes recorded Faruki making numerous false statements to TradeStation employees in the process of trying to obtain individual and institutional trading accounts with TradeStation. Faruki argued before the district court, and argues on appeal, that playing certain portions of the tapes for the jury was unduly prejudicial, in violation of Federal Rule of Evidence 403. A "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice …." Fed. R. Evid. 403. "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011).

At trial, the district court heard arguments from the government about why the tapes should be played and ultimately concluded:

> The tapes were admitted yesterday. I do think they are part of the back end of the scheme in setting up this account. I have taken a look at the transcripts of these tape recordings. There is some information that might not be accurate representations made by the defendant, and I

think they are prejudicial, but given the allega-
tions in this case, I don't find them unduly prej-
udicial.

Faruki challenges the district court's determination. He ar-
gues that playing portions of the TradeStation tapes for the
jury—particularly, the portions in which he makes numerous
misrepresentations to TradeStation employees in an attempt
to open trading accounts—was unduly prejudicial because
the tapes implicate propensity evidence concerns, as outlined
in Federal Rule of Evidence 404.[4] We note, however, that Fa-
ruki does not make an explicit Rule 404 argument; rather, he
argues that the playing of the portions of the tapes was un-
duly prejudicial within the framework of Rule 403. We there-
fore limit our analysis to consideration of Faruki's Rule 403
objection.

We find that the district court did not abuse its discretion
in concluding that the presentation of the portions of the tapes
to the jury was not unduly prejudicial. There is no evidence
that the district court either failed to consider Faruki's argu-
ments or applied an incorrect standard in adjudicating the
Rule 403 objection. The district court appropriately balanced
the probative value of the evidence against the danger of prej-
udice, as it was required to do. Although the district court
stated that it believed the playing of the tapes would be "prej-
udicial," it determined that it would not be "unduly" so,

---

[4] Faruki claims that the playing of the tapes for the jury was prejudi-
cial because the tapes tended to suggest that if Faruki made false state-
ments to TradeStation, he likely made false statements to Tishfield as well.
Per Rule 404, "[e]vidence of a person's character or character trait is not
admissible to prove that on a particular occasion the person acted in ac-
cordance with the character or trait." Fed. R. Evid. 404.

given all of the other evidence in the case. This analysis tracks the balancing test district courts are obligated to perform when considering Rule 403 objections. *See United States v. Khan*, 508 F.3d 413, 417 (7th Cir. 2007) ("Rule 403 instructs the court to balance the probative value of the evidence against 'the danger of unfair prejudice, confusion of the issues, or misleading the jury, or … considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'"). Accordingly, the district court did not abuse its discretion in allowing the tapes to be played.

### 2. *Limitation of Faruki's Cross-Examination*

Faruki also argues that the district court violated the doctrine of completeness, codified by Federal Rule of Evidence 106, and the Confrontation Clause of the Sixth Amendment by limiting his cross-examination of TradeStation employee Lance Baraker. We review a district court's limitation on the scope of cross-examination for an abuse of discretion. *United States v. Sasson*, 62 F.3d 874, 882 (7th Cir. 1995). But if the restriction directly implicates the Sixth Amendment right to confrontation, we review de novo. *Id.* (citing *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995)).

At trial, Faruki sought to cross-examine Baraker about portions of a conversation with Faruki that were not part of the transcript or audiotapes already introduced by the government. When Faruki's counsel began to question Baraker about these portions of the conversation, the government objected, contending that Faruki's attempt to introduce his own statements violated the hearsay rule because the statements were not subject to the party-opponent exception used by the government to place Faruki's other statements into evidence.

Faruki's counsel argued that, under the doctrine of complete-
ness, other portions of Faruki's conversation with Baraker
should be admitted and played to provide context for the por-
tions that had already been admitted and played for the jury.
Following a sidebar and an examination of the transcript por-
tions Faruki's counsel sought to introduce, the district court
determined that Faruki's counsel could question Baraker
about Baraker's own statements, but that he could not use the
questioning as an opportunity to put statements by Faruki
into the record:

> I think under the rule of completeness, [Faruki's
> counsel] is going to be allowed to cross-examine
> Mr. Baraker on anything Mr. Baraker said in this
> transcript, that he said, not get into what Mr. Fa-
> ruki is saying, not to put in false exculpatories,
> because that, I think, would be a violation of the
> hearsay rule, but I think he's allowed to im-
> peach Mr. Baraker on any portion of the conver-
> sation.

The government notes that while Faruki properly raised
an objection to the limitation of the cross-examination under
Rule 106, Faruki raises the Confrontation Clause issue for the
first time in his post-trial briefing. Faruki does not dispute
that he failed to raise an objection to the district court's ruling
on Confrontation Clause grounds at trial. Although the ques-
tion of whether a court's limitation of a defendant's cross-ex-
amination offends the Confrontation Clause is generally re-
viewed de novo, we agree with the government that Faruki
forfeited this argument and review only for plain error. *United
States v. Wing*, 104 F.3d 986, 988–89 (7th Cir. 1997). For these

reasons, we review the Rule 106 issue for abuse of discretion and the Confrontation Clause issue for plain error.

First, we find that the district court did not abuse its discretion in limiting Faruki's cross-examination such that the transcript portions could only be used for impeachment purposes, rather than to place Faruki's statements into the record. We are not convinced by Faruki's argument that admission of his additional statements was necessary merely to place "in context" the admitted portion of his conversation with Baraker. The district court properly advised defense counsel that it would exclude any prior out-of-court statements by Faruki offered to prove that Faruki had been truthful in speaking with Baraker. Allowing Faruki to introduce such statements would have violated the hearsay rule.

Moreover, the district court carefully examined the specific portions of the transcript prior to its evidentiary ruling. Rule 106 states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. The district court reviewed the proffered statements and evaluated whether those statements contradicted other statements already placed into the record. The record shows that the court was within its discretion when it determined that the appropriate course of action was to allow Faruki's counsel to cross-examine Baraker about specific statements Baraker made in the taped conversations with Faruki, but only to the extent that the statements impeached Baraker's testimony.

Faruki was not entitled to introduce his own hearsay statements through Baraker to "impeach" earlier statements Faruki had made that were already in evidence. The district court properly found that the appropriate vehicle for the introduction of such evidence would have been for Faruki himself to have taken the stand. Thus, the district court's limitation on cross-examination was not an abuse of discretion and did not violate the standard of "fairness" contemplated by Rule 106.

Second, the district court did not commit plain error by limiting Faruki's cross-examination of Baraker in the manner described. Faruki argues that his Confrontation Clause rights were violated because he was unable to engage in a "rigorous" cross-examination of Baraker without introducing the other statements by Faruki. He also claims that his rights were violated because the government did not put Charles Runyon, another TradeStation employee, on the stand so that Faruki could "clear up his statements through cross-examination" of Runyon. Faruki claims that it was improper of the government to rely solely on Baraker's testimony.

This argument is unconvincing. The district court's decision to limit cross-examination of Baraker did not violate Faruki's right to present a defense under the Sixth Amendment. The Sixth Amendment's Confrontation Clause does guarantee a defendant a right to effective cross-examination. *United States v. Jackson*, 540 F.3d 578, 591 (7th Cir. 2008). But the district court has wide discretion to impose reasonable restrictions on cross-examination. *Id.* The restriction in this case was narrow—it only prevented Faruki from introducing his

own out-of-court statements on the recordings. It was also justified on reasonable grounds, namely an effort to adhere to the hearsay rule.

Moreover, the statements by Runyon and Baraker were non-testimonial and placed into evidence solely to provide context for Faruki's statements on the recordings. Non-testimonial statements do not require confrontation. *See United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009) ("[P]laying the tapes of those conversations for the jury does not violate the Confrontation Clause so long as those tapes are offered to provide context for the defendant's own admissions."). In short, this restriction did not violate Faruki's Sixth Amendment rights and the district court did not commit plain error in limiting Faruki's cross-examination of Baraker.

### III. Conclusion

For the foregoing reasons, we AFFIRM.