In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 15-3830 and 16-1471

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID JOHNSON and REGINALD T. WALTON,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 13-CR-00104 — **William T. Lawrence**, *Judge.*

_____

ARGUED FEBRUARY 6, 2017 — DECIDED NOVEMBER 3, 2017

_____

Before ROVNER and WILLIAMS, *Circuit Judges*, and CONLEY,
*District Judge.*[*]

WILLIAMS, *Circuit Judge.* The Indianapolis Land Bank was
created to improve the quality of life in Indianapolis neigh-
borhoods by returning tax-delinquent and other troubled

---

[*] Of the Western District of Wisconsin, sitting by designation.

properties into productive use. But, in 2011, Reginald Walton, the manager of the Land Bank, began scheming with others, including David Johnson, to use the Land Bank as a personal piggy bank by orchestrating the sale and resale of the City's properties through a nonprofit loophole and pocketing the profits. The total loss to the city was $282,782.38. For their role in this scheme, Johnson and Walton were indicted and found guilty of honest services wire fraud, wire fraud, and conspiracy to engage in money laundering. Walton was also convicted of receiving bribes.

On appeal, Walton and Johnson challenge the sufficiency of the evidence, arguing that the government failed to prove that either Walton or Johnson had the requisite intent for a fraud conviction. We find the government provided substantial evidence that Walton and Johnson had specific intent, including evidence of kickbacks and making false statements. Walton and Johnson also challenge their money laundering convictions, but there was sufficient evidence to support those convictions as well.

Walton also challenges the district court's jury instructions, arguing that the court's instruction on 10 U.S.C. § 666 permitted the jury to convict him of accepting a gratuity and not a bribe, and that § 666 should only permit conviction for bribes. We find no clear error in the § 666 instruction. The court's instruction and record evidence made clear that Walton was convicted for accepting bribes, not gratuities, and we decline Walton's invitation to overturn precedent to reconsider the construction of § 666. Johnson and Walton's assertion that the district court erred by failing to provide a good faith instruction is also incorrect. Their convictions required proof

of their bad intent (specific intent to commit fraud), so a good faith jury instruction was unnecessary.

Finally, Walton and Johnson challenge their sentences. Both were subject to a sentencing enhancement because their offenses involved a public official in a high-level decision-making position (Walton). We find this enhancement was proper, because as the manager of the Land Bank, Walton was in a sensitive position. We also find no error in the district court's decision to enhance Walton and Johnson's sentences because they victimized vulnerable families.

## I.    BACKGROUND

### A.  The Land Bank

In 2011, Reginald Walton was the manager of the Indianapolis Land Bank, a public agency authorized by Indiana law to acquire abandoned, tax delinquent, and other problem properties. Walton's official title was Assistant Administrator for the Department of Metropolitan Development ("DMD"), but his specific position gave him primary authority over acquiring and selling properties in the Land Bank. Once a property was in the Land Bank, Walton was responsible for getting it sold. He drafted resolutions that instructed when and to whom the properties would be sold. The resolutions he drafted were reviewed by his direct supervisor, Jennifer Fults, and submitted to the Metropolitan Development Commission ("MDC"), where they were usually approved without question. Once the MDC approved a transaction, Walton had his team draft the deed and sales disclosure on behalf of the DMD, and ultimately the Land Bank conveyed the property as Walton proposed and he signed on behalf of the City.

Under the state laws regulating the Land Bank, there were two ways for Land Bank property to be sold. If property was sold to a for-profit entity or private buyer, two appraisals had to be prepared, and the property could then be offered in a public sale at a minimum price of the average of the two appraisals. A secondary process was available only for nonprofit organizations that met specified criteria. A nonprofit was eligible to purchase through the second process if it had been in existence for at least one year, had the mission of housing, and aimed to benefit people with low to moderate incomes. Eligible nonprofits could purchase Land Bank properties for set rates of $2,500 if the property had a clean title or $1,000 if the property did not have a clean title. No appraisal was required, nor was a public sale. But, because of the criteria, few nonprofits were qualified to take advantage of the lower pricing scheme. There was no prohibition on eligible nonprofits reselling their acquired properties.

### B. Walton's Land Bank Transactions

For some time, Walton operated the Land Bank as it was intended. However, in May 2011, Walton met Aaron Reed, a laid off graphic designer who was seeking financial opportunities in real estate. At the meeting, Walton explained that he ran the City department that oversaw abandoned homes. Reed and Walton discussed the Land Bank as an opportunity to make money. Soon thereafter, Reed established Naptown Housing Group ("Naptown"), a property development company and went into business with Walton. The two spoke with an accountant who suggested that Walton start a consulting firm to handle his private real estate deals. However, Walton

rejected this idea because of conflicts with his work and his marital problems. Walton wanted to remain a silent partner.

That's how the scheme began. Walton then started to identify valuable properties in the Land Bank and invited select nonprofit organizations to purchase these properties for either $1,000 or $2,500. He worked with nonprofits that he knew would immediately transfer the properties back to Reed, Naptown, or a chosen private buyer and turn over the profits of the sales. Once the property was purchased for $1,000 or $2,500, Naptown either sold the property to a private buyer, renovated it for sale, or prepared it as a rental. Reed's profit margin was high and, as agreed upon, he paid half of the profits to Walton in cash.

The first properties Reed and Walton partnered to sell involved 2806 and 2810 Delaware. Walton told Reed that the properties had generated interest from potential buyers, and they agreed to sell it together and split the profit. The property was purchased through TM&J Youth Foundation, a nonprofit operated by Shela Amos, which paid $2,501 for 2806 Delaware and $601 for 2810 Delaware.[1] Naptown then resold the property in a $65,000 cash deal. For his part in the deal, Reed gave Walton $27,500 cash. Walton said he had to be paid in cash due to his position with the City. Reed gave money to Walton as a "kickback" for "push[ing] the property through his department" at the DMD. Reed knew they were breaking the law.

---

[1] The combined price of the two properties was lower than the standard nonprofit rate for both properties because one was a parking lot.

Reed and Walton's partnership continued with the sale of at least ten additional Land Bank properties, including the sales of 3905 North Carrollton Avenue, 3253 and 3249 North Ruckle Street, and the "Indianapolis duplexes," four sets of duplexes on Indianapolis Avenue. Reed testified that Walton gave him "right–to-enter forms" for properties they intended to purchase, so that Reed could inspect them before buying. While they made profit from each of their sales, some of the properties Reed and Walton bought were still owned by Naptown with plans to rent or sell when Reed and Walton's arrests ended the scheme.

In addition to working with Reed, Walton also began working with John Hawkins, a former Special Assistant to the Mayor of Indianapolis and a project manager at the DMD. Hawkins noticed Walton was getting money back for helping people. When he asked about it, Walton told him that they were "love offerings." Hawkins asked to get involved, and he did. Hawkins brought at least two potential buyers to Walton. In one of the sales, the buyer paid Walton and Hawkins $7,200 cash before the property was transferred from MDC to the co-operating nonprofit. In text messages referencing this deal, Walton indicated that if there were any "heat" from the MDC, he would be able to handle it. Walton gave Hawkins $1,600 cash for bringing in the deal.

Walton also had dealings with Randall Sargent and undercover FBI agent "Jay Foreman."[2] Walton helped Sargent buy six properties from the Land Bank in exchange for a "top shelf fee" for ushering the properties through the Land Bank. Once

---

[2] Foreman testified using his undercover name as he is involved in other ongoing investigations.

the DMD transferred the properties to a nonprofit Sargent operated, Sargent gave Walton a blank $500 money order. Foreman also sought to acquire Land Bank property through Walton and agreed to "take care of" him for pushing property through the DMD. Walton showed Foreman some Land Bank properties and told him about his dealings with Aaron Reed. Walton also told Foreman that he did government consulting and received kickbacks for his help. Walton accepted $500 from Foreman, and told Foreman he would go to his office and start working on a deal.

### C.  Johnson and IMAC's role

Some of the nonprofits Walton and Reed used for their earlier real estate transactions became unavailable, so they incorporated a new partner, David Johnson. Johnson ran the Indianapolis Minority Aids Coalition ("IMAC"), an eligible nonprofit purchaser under the Land Bank rules, and he quickly became a necessary part of the scheme. Walton knew Johnson through Johnson's earlier work with the City and recruited him to help acquire properties.

Reed and Walton went to Johnson's office to propose the partnership. They told Johnson how the process worked, and explained that they would split proceeds. Reed and Walton told Johnson there was an additional party, a broker. But, this was a lie allowing Walton and Reed to receive a larger portion of the profits. Walton and Reed emphasized Walton's position with the City, and warned Johnson it was important not to disclose their dealings. Johnson agreed to become involved, and he began using IMAC to acquire Land Bank properties to sell for profit for Walton and others involved in the scheme.

On their first deal, Walton and Reed intended to sell a property to a private buyer for $17,500. The property was sold to IMAC, then to the private buyer. Johnson took $2,500 to cover IMAC's purchase cost, retained an additional $1,000 for himself, and then wrote a $14,000 check to Naptown, falsely indicating on the IMAC check that the money was for a grant. On the second deal, Walton and Reed purchased a property that had garnered interest from investor groups. Walton orchestrated the sale to IMAC, but used his position to defer the City's collection of the property purchase price. IMAC never paid the City for the property. However, Reed paid Johnson for serving as a middleman. On the third deal, Walton obtained approval of another property, and again got the City to defer IMAC's payment for the property. The property was sold for $12,500 and Johnson retained $1,500 to pay DMD for IMAC's purchase, retained $1,000 for himself, wrote Naptown a $5,500 check, and paid Walton a $4,500 cash kickback.

Johnson was also integral in the Land Bank property sales involving John Hawkins. In each of those transactions, IMAC served as the middleman nonprofit buyer. In fact, on the day the City transferred a property at 3516 Salem Street to IMAC at the arrangement of Walton and Hawkins, Johnson wrote an IMAC check to Hawkins for $1,000 which falsely indicated that the payment was for "Payroll: Consulting: 2013 Gala." Hawkins never performed any consulting work for an IMAC gala in 2013. Johnson later sold the property to a private developer for $8,000.

### D. Amos Fraud Victims

In August 2012, the Marion County Prosecutor's Office charged Sheila Amos with fraudulently selling properties she did not own to unsuspecting victims, mostly poor Hispanic

families who spoke little or no English. Some of the properties Amos "sold" were actually properties in the Land Bank, and the prosecutor and two detectives on the case approached the City about helping the victims remain in these properties. They met with Walton, and he agreed on behalf of the City to arrange for some of the victims to purchase and stay in their homes (those owned by the Land Bank). At a later meeting, Walton told the Amos victims that they would be able to purchase their homes for either $1,000 or $2,500 through a nonprofit.

Walton pushed a sale of the properties through IMAC to get the nonprofit price of $1,000 for each property. At closing, however, Walton told the victims the price for each property was $4,000, and must be paid in cash. When asked why the price had increased, Walton said that the difference was meant to benefit IMAC. However, after the purchase, Johnson kept a portion of the money and paid the rest to Walton.

### E. Indictment and Trial

On May 14, 2013 the government filed an eight-count indictment naming Walton, Johnson, Reed, Hawkins, and Sargent. A week later, the defendants were arrested. On October 16, 2013, an eleven-count Superseding Indictment was filed. Counts 1-4 alleged honest services wire fraud by all of the defendants, Count 5 alleged additional wire fraud by Walton and Johnson in connection with the Amos fraud victims, Counts 6-10 alleged that Walton received bribes, and Count 11 alleged that Walton and Johnson conspired to commit money laundering.

Reed, Hawkins, and Sargent each pled guilty and testified against Walton and Johnson as government witnesses. After

an eleven-day trial, the jury found both Walton and Johnson guilty. Walton was convicted on Counts 1-5, 8, 10, and 11, and was sentenced to 108 months in prison, which was below the guidelines range of 135-168 months. Johnson was convicted on Counts 2, 3, 5, and 11 and sentenced to 66 months, which was below the guidelines range of 87-108 months. On appeal, they challenge the sufficiency of the evidence supporting their convictions, the jury instructions, and their sentences.

## II. ANALYSIS

### A. Sufficient Evidence for Honest Services Fraud, Wire Fraud, and Money Laundering Convictions

Appellants raising insufficiency challenges face "a nearly insurmountable hurdle." *United States v. Tucker*, 737 F.3d 1090, 1092 (7th Cir. 2013) (quoting *United States v. Pulido*, 69 F.3d 192, 205 (7th Cir.1995)). We review a trial court's ruling on a Rule 29 motion *de novo*, asking only "whether evidence exists from which any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *United States v. Doody*, 600 F.3d 752, 754 (7th Cir. 2010). Reversal under this standard is rare because we defer heavily to the jury's findings and review evidence in the light most favorable to the government. *Id*. We reverse only where "no rational trier of fact could have found the defendant guilty… ." *Id*.

### 1. Evidence of Walton's Intent

For a conviction of wire fraud, the government was required to prove that Walton was "(1) involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of that scheme." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) (quoting *United States v Faruki*, 803 F.3d 847, 852 (7th Cir. 2015)). Evidence proves intent

where it shows that a defendant acted "with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Id*. at 355 (quoting *Faruki*, 803 F.3d at 853).

Walton argues there is no evidence he had the specific intent to commit fraud. He argues he was "a little cog in a big machine" and could not acquire property from the Land Bank without his resolutions being reviewed and approved by his superiors and the DMD. He claims that he was under pressure to get Land Bank properties sold and selling through nonprofits was beneficial to the City. He also asserts that there was absolutely nothing wrong with a for-profit company buying property from a nonprofit, and highlights evidence that a few coworkers purchased property from the Land Bank. He concludes that the evidence shows he did not get paid for doing anything he would not otherwise do.

Even if Walton were able to paint some interpretation of the facts that would render him without fraudulent intent, he would not be entitled to relief. We do not review evidence to determine whether any rational factfinder could have decided in favor of a defendant. The standard demands that we find whether a reasonable juror could find guilt. Considering the evidence in the light most favorable to the government, the answer to that question is overwhelmingly yes.

The government offered extensive evidence that Walton intended to commit fraud. At trial, Walton admitted he intended to earn money from Land Bank sales. He admits in his brief that he knew profiting from the sales of Land Bank properties was "questionable ethically," which is why he got paid in cash and tried to be the silent partner. But, he claims that he did not know his actions were illegal. However, a mistake

of law is not a defense to honest services fraud. *United States v. Blagojevich*, 794 F.3d 729, 738-39 (7th Cir. 2015). Walton's Land Bank scheme partners testified with details about each of the Land Bank transactions Walton pushed through. The jury was well within reason to infer from this evidence that Walton knew he was cheating "for the purpose of getting financial gain for [him]self" and intended to commit fraud. *Weimert*, 819 F.3d at 355. We find no reason to question the jury's verdict for want of evidence.

Walton also argues that honest services fraud requires proof of a *quid pro quo*, and that a mere breach of a fiduciary duty is not enough to support his conviction. While a correct statement of law, this argument fails to undermine Walton's conviction. In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court made clear that an honest services fraud prosecution requires proof of a kickback or bribe. This Circuit has followed that directive. *See Weimert*, 819 F. 3d at 367; *see also United States v. Nayak,* 769 F.3d 978, 980–81 (7th Cir. 2014) (affirming mail fraud conviction of doctor who paid bribes and kickbacks to encourage referrals); *see also United States v. Vrdolyak,* 593 F.3d 676, 678 (7th Cir. 2010) (explaining guilty plea based on hidden kickback from buyer to seller's director).

But here, Walton's argument fails because the government's case against Walton showed a straightforward *quid pro quo* scheme. Walton intended to deprive the City of his honest services by accepting bribes and kickbacks from third-party partners who relied on Walton to facilitate transfers of valuable Land Bank properties at low cost. These actions established a violation of 18 U.S.C. §§ 1343 and 1346. *See Skilling*, 561 U.S. at 404 ("[F]raudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a

third party who has not been deceived" violate 18 U.S.C. §§ 1343 and 1346); *see also Hawkins*, 777 F.3d. at 883–84 ("A plan to take money in exchange for an official act constitutes a scheme to defraud."). Evidence of an illegal *quid pro quo* was abundant. At least three individuals who paid kickbacks, Reed, Sargent, and Hawkins, detailed how Walton sought, and was paid, cash kickbacks. Influenced by these kickbacks, Walton would draft resolutions assuring his partners could acquire Land Bank properties at nonprofit prices. Walton's supervisors testified that Walton did not disclose his self-dealing to the City, despite being a trusted City employee. This evidence allowed a reasonable jury to infer an intentional *quid pro quo*.

Walton also challenges his conviction for wire fraud (Count Five), arguing that the details of the transaction were disclosed and the fraud stemmed from the fraud of Sheila Amos. The evidence underlying this count reflected that Walton and Johnson worked with the Marion County Prosecutor's office to secure low-priced homes for individuals who risked homelessness and had been victims of a fraud by Sheila Amos (the "Amos Victims"). Walton told the Amos Victims they would be able to obtain the properties for $1,000 and arranged for Land Bank properties to be sold through IMAC. However, at the last minute he and Johnson told them the properties cost $4,000 each. Walton and Johnson pocketed $3,000 from each sale.

Walton argues that all of the terms of this transaction were disclosed and the "only fact… omitted was the full negotiation position of the parties, in that Mr. Walton would not gain anything on the transaction." There is no question Walton intended to benefit from the inflated price of the Amos Victim'

properties, and this constituted fraud. Walton was not sup-
posed to be a party to the transaction. *Cf. Weimert* 819 F.3d. at
367–68 (finding no fraud where there was no undisclosed self-
dealing and all parties were aware of the defendant's conflict
of interest). He, together with Johnson, purposefully swin-
dled the Amos Victims for personal gain. So, there was suffi-
cient evidence underlying this conviction.

### 2. Evidence of Johnson's Intent

Johnson also argues that the government failed to provide
evidence of his intent. As we have noted, "[i]t is exceedingly
difficult to win on this basis, once a jury has weighed the evi-
dence and found guilt beyond a reasonable doubt." *United
States v. Dingle*, 862 F.3d 607, 614 (7th Cir. 2017). Because John-
son focuses on intent, this "makes our job relatively easy." *Id*.
We review whether any rational trier of fact could have found
intent based on the government's evidence. *Id*. (quoting *Jack-
son v. Virginia*, 443 U.S. 307, 319 (1979).

A reasonable juror could conclude that Johnson intended
to engage in fraud. Such a conclusion was supported by testi-
mony that Johnson knew the Land Bank properties belonged
to the City, knew Walton's position with the City and poten-
tial conflicts, paid Walton a $4,500 cash kickback, and partici-
pated and personally benefitted from Land Bank property
sales. Evidence also showed that he made at least one large
deposit into his personal bank account and purchased a Volvo
with ill-gotten gains. He actively concealed the scheme by
writing false entries in the memo line of kickback checks and
removing Walton's name from property lists he forwarded to
potential purchasers. While Johnson asks us to disregard gov-
ernment witness Reed's testimony and consider evidence

which he claims shows his lack of intent, the standard of review does not permit us to do so. Determining credibility of witnesses and weight of the evidence is the prerogative of the jury. While we acknowledge that IMAC's mission, serving AIDS and HIV-afflicted people, is commendable, that is no reason for us to assume, as Johnson requests us to do, that Johnson's sole motivation in the Land Bank scheme was to help as many AIDS and HIV afflicted people as possible get subsidized housing. In fact, evidence contradicts this, and a reasonable juror could reject such an interpretation of the record. The jury was reasonable to infer that Johnson had specific intent.

Defendants, citing *United States v. Pettigrew*, 77 F.3d 1500 (5th Cir. 1996), argue that if we vacate their convictions for fraud, we should also vacate their related money laundering convictions. But, since we decline to vacate Walton or Jonson's convictions for fraud, we will decline their invitation to vacate related convictions for money laundering.

### B.  No Error in Jury Instructions

"We have repeatedly held that approval of a jury instruction in the district court extinguishes any right to appellate review of the instruction." *United States v. Trudeau*, 812 F.3d 578, 589 (7th Cir. 2016), cert. denied, 137 S. Ct. 566 (quoting *United States v. Yu Tian Li*, 615 F.3d 752, 757 (7th Cir. 2010)). Here, when the district court asked defense counsel whether he had reviewed the district court's final proposed instructions and had any objections to these instructions, counsel indicated that he read the instructions and had no objections. The government argues that this approval waived Walton

and Johnson's right to now bring a challenge. The defendants provide no counter to this argument.

Distinguishing purposeful waiver from negligent forfeiture is tricky where, as here, defense counsel approves jury instructions in a "rote call-and-response colloquy with the district judge." *United States v. Natale*, 719 F.3d 719, 731 (7th Cir. 2013). Recent decisions in this circuit recognize the harshness of waiver and hesitate to determine blanket approvals "knowing and intentional decision[s]" to forego a challenge without further analysis. *Id*. at 729 (quoting *United States v. Jaimes–Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005); *see also United States v. Ajayi*, 808 F.3d 1113, 1121–22 (7th Cir. 2015) (applying plain error review even though counsel stated "no objection" during colloquy). Analyzing whether defendants' approval of the final instructions was knowing and intentional is further complicated because they do not provide any argument against waiver.

In any event, even if defendants' challenges were not waived, they are at the very least forfeited, and we review forfeited arguments for plain error. *United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012). We find plain error only where the instructions do not fairly and adequately represent the issues. *United States v. Davis*, 471 F. 3d 783, 791 (7th Cir. 2006). Plain error requires an "obvious" error that is "clear under current law." *Natale*, 719 F.3d at 731 (quoting *United States v. McGee*, 60 F.3d 1266, 1271–72). We will find plain error only where the error affected defendant's substantive rights. *Jaimes-Jaimes*, 406 F.3d at 848. Defendants' challenges fail to show any error, much less plain error.

### 1. Bribery Instruction Not Erroneous

Walton argues that the jury instructions relating to his 18 U.S.C. § 666 bribery charges were erroneous because they permitted the jury to convict him of accepting a "gratuity" and not a bribe. The challenged instruction stated that Walton could be found guilty if he "accepted anything of value from another person" and "acted corruptly with the intention to be influenced or rewarded in connection with some transaction or series of transactions… ." The instruction further clarified that a "person acts corruptly when that person acts with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties." Walton now asserts that this jury instruction allowed him to be convicted for a "gratuity" offense and argues we should overturn precedent to hold that 18 U.S.C. § 666 excludes criminalization of receipt of a gratuity.

Walton's "gratuities" argument does not fly as a matter of law. As Walton acknowledges in his brief, this court has ruled that the word "reward" in § 666 criminalizes the receipt of bribes *and* gratuities. *United States v. Hawkins*, 777 F.3d 880, 881 (7th Cir. 2015) ("§ 666 forbids taking gratuities as well as taking bribes."). So, the district court's instruction, even if it permitted conviction for taking a gratuity, certainly was not clearly erroneous under current law.

Further, the jury instruction Walton challenges did not, in fact, permit conviction based on a gratuity. Walton makes a long argument focused on the word "reward" in the jury instruction and argues that "reward" could be read to constitute a gratuity offense separate from a bribery offense. He argues against such a construction of the statute. Citing *United States v. Anderson*, 517 F.3d 953 (7th Cir. 2008), Walton highlights

that unlike a gratuity, a bribe must be made with a corrupt purpose, such as inducing a public official to influence his official action. He also notes that the penalty for gratuities (under § 201) is significantly lower than potential penalties under § 666. And, he argues that this court should explicitly exclude gratuity offenses from § 666 and only criminalize bribery.

However, the challenged instruction did not criminalize gratuities. To the contrary, the challenged instruction made Walton's conviction contingent on whether he "acted corruptly with the intent to be influenced… ." In other words, the jury instructions permitted conviction only if the jury found Walton had accepted bribes. Walton's attack on a hypothetical "gratuities" instruction lacks any merit, and we need not entertain it.

Walton's argument is also inconsistent with the facts of this case. The evidence at trial exposed Walton's receipt of kickbacks (bribes), not gratuities. The record established that Walton passed specific properties through specific channels at specific times to chosen parties for the purpose of getting a prearranged payment. Walton again asserts that these were not bribes, because he did not do anything he would not otherwise have done. We disagree. Evidence indicates that Walton steered properties toward partners who promised payments in favor a person who would not. Because Walton's intent to be paid for his official acts existed before he transferred Land Bank properties, this is simply not a gratuities case.

### 2. Good Faith Jury Instruction Not Required

Both Walton and Johnson argue that they were entitled to a "good faith" jury instruction, which they claim was their

theory of defense. Neither defendant can show any plain error here. Seventh Circuit precedent, including the case cited by defendants, *United States v. Manjarrez*, 258 F.3d 618 (7th Cir. 2001), makes clear that it "is unnecessary to give a particular defense instruction if its essential points are covered in another instruction." *Id*. at 626. A good faith instruction is not required where lack of good faith is part of the charge. *United States v. Kokenis*, 662 F.3d 919, 930 (7th Cir. 2011). Because Johnson and Walton were convicted of crimes that required the jury to find bad faith, and specifically the intent to commit fraud, they were not entitled to an additional instruction for good faith.

### C. No Errors in Sentencing

Walton and Johnson both bring challenges to the sentences they were given in the district court. A district court's legal interpretation of the sentencing Guidelines is reviewed *de novo*, and factual findings are reviewed for clear error. *United States v. Hayes*, 872 F.3d 843, 845 (7th Cir. 2017) (quoting *United States v. Harris*, 718 F.3d 698, 703 (7th Cir. 2013). Both of the challenges brought by defendants are based on fact, so we review for clear error. Because Johnson's counsel did not object to his sentencing enhancements in the district court, his claim on appeal is reviewed for plain error. *Id*. at 847.

### 1. Enhancement for Walton's Sensitive Position Not Erroneous

The defendants first argue that the district court erred by enhancing their sentences based on Walton's role as a public official in a high-level decision making process. Whether an individual is a public figure in a high-level decision making

or sensitive position is a factual determination, reviewable for clear error. *See Hawkins*, 777 F.3d at 884-85.

The sentencing guidelines provide that "if the offense involved an elected public official or any public official in a high-level decision making or sensitive position, increase by 4 levels." U.S.S.G. § 2C1.1(b)(3). Application Note 4 to § 2C.1 states that "[h]igh level decision-making or sensitive position means a position characterized by a direct authority to make decisions for, or on behalf of a government, department, agency, or other government entity, or by a substantial influence over, the decision making process." At Walton's sentencing hearing, the district court found that "Walton had substantial influence over the decision-making process of the Land Bank based upon [its] review of the testimony." The court further found that "[t]he fact that others could review Mr. Walton's decision does not negate the fact that he held a sensitive position." Analogizing this case to *United States v. Hill*, 645 F.3d 900, 906-07 (7th Cir. 2011), the district court found that Walton was in a sensitive position under U.S.S.G. § 2C1.1(b)(3), and applied this enhancement to both Walton and Johnson's sentences.

We find no clear error here. Walton was the director of the Land Bank, and in that capacity he had an inordinate amount of discretion over the transfer of Land Bank properties. He started and oversaw the process, drafted the resolutions that were rarely questioned, and generally determined who would acquire the City's properties and whether the sale would be through a cooperative nonprofit like IMAC. Even though Walton was not the top of the DMD organizational chart, he was one of 16-20 assistant administrators. While he had supervisors that technically outranked him, his authority

over the Land Bank was unique, and he certainly had substantial influence over the decision making process.

The district court was correct to analogize this case to *Hill*, 645 F.3d at 906-07. In *Hill*, the deputy liquor commissioner in East St. Louis (named Hill), was given the ability to accept and review applications for liquor licenses and conduct background checks by the mayor. *Id.* at 904. The mayor had the ultimate authority for the issuance and renewal of liquor licenses, and in Hill's position, he could not establish policy, did not supervise other employees, and was subject to the mayor's supervision. Such factors did not foreclose a finding that a sentencing enhancement should apply. The district court acknowledged that while Hill did not have a particularly high-level position, he held a sensitive post and had "substantial influence over the licensing process." *Id.* at 907. The same can be said for Walton's position at the Land Bank. While Walton did not have a high rank or title within the City, he drafted resolutions recommending transfers of Land Bank properties to specific buyers for specific prices at specific times. Walton did not have overt influence over his superiors, but his resolutions were scarcely scrutinized, giving him *de facto* control over how and to whom Land Bank Properties were sold. The record supports that Walton's position was sensitive, so the district court's application of an enhancement pursuant to U.S.S.G. § 2C1.1 was not clearly erroneous.[3]

---

[3] We review for plain error whether the district court made a sentencing error as to Johnson. The plain error standard is more deferential to the district court than clear error analysis, and because we find that the defendants' challenge to the district court's application of U.S.S.G. § 2C1.1 fails to demonstrate clear error, it certainly fails under plain error analysis as well.

### 2. Amos Victims Were Vulnerable Victims

The defendants also argue that the district court erred by applying the "vulnerable victim" enhancement of U.S.G. § 31A1.1(b)(I). A "vulnerable victim" is a victim who is "particularly susceptible to the criminal conduct." *United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003).

In concluding that the Amos Victims were vulnerable, the district court stated:

> The victims in this scheme, as we all know, were 14 Hispanic families who spoke little or no English. Some were undocumented … and all had minimal experience in conducting real estate transactions in the United States … [E]ach had previously been the victim of real estate fraud perpetrated by a different person, and that made them particularly susceptible to this type of fraud … They were told to bring cash, and they would only accept cash. Again, the Court heard the testimony of these individuals and feels that they were indeed vulnerable victims and the two-level enhancement should apply.

During the sentencing process, several victims testified regarding the extent of the harm they suffered due to the fraud inflicted upon them. Neither Walton nor Johnson refuted that they should have known that the Amos Victims were vulnerable.

Now, according to the Defendants, the Amos Victims were not vulnerable because they were afforded the services of an interpreter through the Marion County prosecutor's office and got decent prices on their homes. We disagree. In fact, the involvement of the prosecutor's office likely bolstered the

Amos Victims' trust, making them more susceptible. And, the so-called decent prices of the homes were 300% higher than they should have been and higher than the cost originally quoted by Walton – highlighting the desperation of the families to secure a home and avoid homelessness. We find no error in the district court's finding of vulnerability.

The record makes clear that the Amos Victims were vulnerable for all of the reasons enumerated by the district court. They were undocumented, had poor (if any) English fluency, had been previously victimized, were extremely low-income, and were facing the threat of homelessness. The defendants argue that the Amos Victims' lack of English fluency did not make them vulnerable. However, we agree with the district court that the Amos Victims' poor command of the English language was one of many factors weighing toward vulnerability. *C.f. United States v. Esterman*, 324 F.3d 565, 574 (7th Cir. 2003) (finding it was clear error to consider the linguistic factor in isolation in determining that a savvy businessperson was a vulnerable victim). Other factors included that they did not have the bargaining power or real estate sophistication to negotiate Walton and Johnson's inflated price and they were desperate to secure housing for their families. We find no error in the district court finding the Amos Victims vulnerable for the purposes of Walton and Johnson's sentences.

## III.    CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.